UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LUKE C. CODY, )
 )
 Plaintiff, )
 )
 vs. ) Case No. 4:16 CV 1632 (JMB)
 )
MARY HASTINGS, M.D., )
 )
 Defendant. )

## MEMORANDUM AND ORDER

This matter is before the Court on defendant's motion for summary judgment. Appointed counsel has filed a response in opposition on plaintiff's behalf and the issues are fully briefed. In addition, plaintiff has filed a motion to strike portions of the affidavit of Bruce R. Bacon, M.D., submitted by defendant.[1] The Court has not relied on the portions of Dr. Bacon's affidavit that plaintiff moves to strike and the motion will be denied as moot. All matters are pending before the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c).

---

[1] Plaintiff argues that defendant did not properly disclose Dr. Bacon as an expert under Rule 26(a)(2), Fed.R.Civ.P. Defendant asserts that Dr. Bacon is a treating physician who is not required to provide a report and that she has met her disclosure requirements because she listed Dr. Bacon in supplemental disclosures. "The disclosure rule is less demanding for experts that are not specially employed or retained for litigation, such as treating physicians." Vanderberg v. Petco Animal Supplies Stores, Inc., 906 F.3d 698, 702 (8th Cir. 2018). The rule requires parties to disclose the identity of non-retained experts who may testify at trial and disclose "the subject matter on which the witness is expected to present" expert opinion testimony and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). Defendant's disclosure states that Dr. Bacon "supervised the care of Nurse Practitioner Shirley Campbell, and both are believed to have discoverable information regarding plaintiff's Hepatitis C diagnosis, including issues of causation." [Doc. # 70-1]. The Court is doubtful that this statement constitutes an adequate summary of Dr. Bacon's ultimate opinion that plaintiff "did not suffer any harm by not being treated during his detention." [Doc. # 59-4 at ¶ 15]. The Court need not decide this issue, however, because Dr. Bacon's opinion is not necessary for the resolution of plaintiff's claims.

Plaintiff Luke Cody was a pretrial detainee at the St. Louis County Justice Center (Justice Center) from January 2016 through February 2017. He filed this action pursuant to 42 U.S.C. § 1983, alleging that Justice Center physician and medical director, defendant Mary Hastings, M.D., refused to provide necessary treatment for his chronic infection with the hepatitis C virus (also referred to as "HCV"), sleep apnea, and astigmatism, in violation of his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution. Defendant moves for summary judgment, arguing that plaintiff has failed to present any evidence that she was deliberately indifferent to his serious medical needs.

I. Factual Background

A. Hepatitis C and its Treatment[2]

"HCV is a viral infection that can cause liver damage and other extremely serious side effects. Those who contract HCV may suffer inflammation of the liver, known as hepatitis. In turn, those with hepatitis may suffer significantly impaired liver functioning. A decrease in liver function may result in symptoms such as severe pain, fatigue, difficulty or pain with urination, and an increased risk of heart attacks." Postawko v. Missouri Dep't of Corr., No. 17-3029, 2018 WL 6379023, at *1 (8th Cir. Dec. 6, 2018). "Individuals suffering from chronic HCV develop fibrosis of the liver, in which healthy liver tissue is replaced with scar tissue. Patients are said to suffer from cirrhosis when a significant portion of the liver has been converted into scar tissue." Id. Cirrhosis is irreversible and some of its complications can cause death if left untreated. Id.

---

[2] For the purposes of this summary of the facts, the Court has reviewed the sources cited by the parties, including: https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm405642.htm; https://www.cdc.gov/media/releases/2016/p0504-hepc-mortality.html; and https://www.hcvguidelines.org. The Court has also relied on the recent opinion in Postawko v. Missouri Dep't of Corr., in which the Eighth Circuit summarizes hepatitis C and its treatment. No. 17-3029, 2018 WL 6379023 (8th Cir. Dec. 6, 2018) (affirming certification of class of individuals in custody of Missouri Department of Corrections with chronic HCV who are not provided treatment with antiviral drugs).

"At least half of all those who suffer from chronic HCV will develop either cirrhosis or liver cancer. Each day without treatment increases the risk that an HCV infection will either develop into a serious condition such as chronic liver disease, fibrosis, cirrhosis, or liver cancer, or cause death from liver failure. HCV causes the death of more American citizens than any other infectious disease." Id.

In recent years, significant medical advancements have been made in the treatment of HCV. "While previous treatments demonstrated only low rates of success and often caused substantial side effects, new direct-acting antiviral drugs (DAA drugs) are estimated to cure over 90% of patients who receive them as treatment. DAA drugs are also estimated to cause a 90% reduction in the risk of liver-related mortality. Those effects, however, may diminish if treatment is delayed." Id. "The medical standard of care put forward by organizations such as the Infectious Diseases Society of America and the American Association for the Study of Liver Diseases (IDSA/AASLD) now recommends that almost all persons with chronic HCV receive DAA drug treatment." Id.

Plaintiff claims that defendant should have treated him with Harvoni, one of the new DAA drugs. According to the IDSA/AASLD Guidelines, "pretreatment assessment of a patient's understanding of treatment goals and provision of education about adherence and follow-up are essential. A well-established therapeutic relationship between clinician and patient remains crucial for optimal outcomes" with the new antiviral therapies.[3] In addition, the interruption in treatment adversely affects the likelihood of achieving a cure and could promote development of viral resistance. Id. The Guidelines note that chronic hepatitis C presents special challenges in jails, where "[t]esting and treatment of hepatitis C have been historically

---

[3] https://www.hcvguidelines.org/evaluate/when-whom (last visited on Dec. 4, 2018).

uncommon . . ., primarily because of the short duration of incarceration and lack of available resources."[4] The Guidelines recommend that "[c]hronically infected individuals should receive counseling about HCV infection and be provided linkage to follow-up community healthcare for evaluation of liver disease and treatment upon release." For those "whose jail sentence is sufficiently long to complete a recommended course of antiviral therapy," they "should receive treatment for chronic HCV infection according to AASLD/IDSA guidance while incarcerated" with referrals to community healthcare on release for surveillance for HCV-related complications. Id.

### B.     Plaintiff's Hepatitis C

On September 17, 2015, plaintiff was seen at the Saint Louis University Liver Center (SLU Liver Center). He was evaluated by advanced practice nurse, Shirley Campbell, NP. See Medical Records SSM-SLUH, Inc. [Doc. # 60 at 11-14].[5] Ms. Campbell's care of plaintiff was supervised by Bruce R. Bacon, M.D. Bruce Bacon Affidavit at ¶ 4 [Doc. # 59-4].[6] Plaintiff told Ms. Campbell that he was diagnosed with hepatitis C in 2006 but he was never treated due to his schizoaffective disorder. He also said that he had been scheduled for a liver biopsy but passed out before it could be completed. When he saw Ms. Campbell in September 2015, he complained of upper right quadrant pain, fatigue, and poor tolerance for activity. [Doc. # 60 at 11].

Lab tests ordered by Ms. Campbell showed that plaintiff had normal liver functioning, with only very mild inflammation of the liver and no increase in fibrosis and no evidence of

---

[4] https://www.hcvguidelines.org/unique-populations/correctional (last visited Dec. 6, 2018).

[5] Materials in the medical records are cited with the CM/ECF document number and the page number that appears in the red header.

[6] The Court relies only on uncontested portions of Dr. Bacon's affidavit.

4

cirrhosis or advanced disease. His disease was "very mild." Bacon Aff. at ¶ 8. Plaintiff declined to undergo a liver biopsy to further clarify his condition. Id. at ¶ 10. Ms. Campbell discussed plaintiff's options with him, including potential participation in a clinical trial with Harvoni or Viekira — both DAA drugs — depending on the genotype of his HCV. The exact course of treatment could not be determined until Ms. Campbell received the results of his lab work, and so she instructed plaintiff to return for follow up in four to six weeks. Id. at ¶ 11; see also Medical Records [Doc. # 60 at 11-12]. Plaintiff was not seen again at the SLU Liver Center,[7] although he did return to SLU Hospital for a drug screen required by his probation officer. Bacon Aff. at ¶ 12; Medical Records [Doc. # 60 at 25-26].

The duration of treatment with Viekira or Harvoni is twelve weeks and should be continuous to ensure treatment is effective. Bacon Aff. at ¶ 11.

### C. Plaintiff's Incarceration and Medical Care

On January 30, 2016, plaintiff was arrested after allegedly assaulting his girlfriend. He was evaluated at the emergency department of the SSM DePaul Health Center after making suicidal statements. Medical Records [Doc. # 63 at 39]. Once in the emergency department, plaintiff was uncooperative and verbally aggressive with the assessor. He was determined to be fit for confinement with suicide watch.[8] Id. at 39-41.

---

[7] Plaintiff denies that he missed any scheduled appointments with Ms. Campbell. Declaration of Luke C. Cody at ¶ 4 [Doc. # 68-2]. He does not dispute the accuracy of Ms. Campbell's notes, however, or claim that he actually returned to the clinic.

[8] The records show that immediately preceding this assault plaintiff had a period of instability due to his mental impairments. He was hospitalized at Mercy Hospital between December 7 and December 12, 2015 for treatment of his depression. [Doc. # 63 at 59-63]. And, on January 17, 2016, he was evaluated at DePaul Health Center, with complaints of auditory hallucinations and suicidal thoughts. At that time, he reported that he was homeless but was awaiting placement by his probation officer. [Doc. # 63 at 1-33].

5

Plaintiff was transported to the Justice Center where he underwent an intake assessment. [Doc. # 61 at 134-35]. Plaintiff reported that he took Seroquel, Wellbutrin, Klonopin, Vicodin, and a medication to treat nightmares. Id. Based on a review of plaintiff's medical records, the intake nurse noted plaintiff's diagnoses of schizoaffective disorder, depressive type, remote history of benzodiazepine dependence, and hepatitis C.[9] Id. at 131-35. Standing orders for treatment of the symptoms of benzodiazepine dependence were entered. Id. at 133. Plaintiff signed requests for information for medical records. Id. at 135; see also Releases [Doc. # 62 at 93-94]. Medical records obtained from Mercy Medical Center indicate that plaintiff reported having a diagnosis of hepatitis C, but did not show that the diagnosis had been confirmed by lab tests or treatment. Def.'s Stmt. of Uncontroverted Material Facts (SUMF) at ¶ 8.

On March 24, 2016, plaintiff completed a Sick Call Form in which he stated that he had been approved for treatment with Harvoni before his incarceration and that he wanted to be started on it while in jail because he expected to remain there "for awhile." He provided Ms. Campbell's name and phone number at the SLU Liver Center. [Doc. # 62 at 74].

Defendant saw plaintiff for the first time on April 4, 2016.[10] [Doc. # 61 at 93-94]. Plaintiff reported that he had joint pain due to degenerative joint disease; dental pain; anxiety, panic, and depression; heartburn; and hepatitis C. Defendant reviewed plaintiff's psychiatric medications, ordered an evening snack to be provided when he took his Seroquel, ordered an

---

[9] Notes of the intake interview suggest that plaintiff denied having any medical conditions, including infections and mental health disorders. Plaintiff asserts that he told the intake nurse that he had hepatitis C. Declaration of Luke Cody at ¶ 5 [Doc. # 68-2]. Any dispute in this regard is immaterial, however, as both parties agree that his hepatitis C was noted in the record on the day he was admitted.

[10] Between his admission on January 30th and this first contact with defendant on April 4, 2016, plaintiff was seen multiple times by nurses and doctors for evaluation and treatment of multiple issues, primarily anxiety with occasional reports of hallucinations. [Doc. # 61 at 126, 124-25, 121, 120, 118, 117, 115-16, 113, 112, 110-11, 104-05, 99, 97]; [Doc. # 62 at 87, 85, 83, 79]. He was placed on lockdown status as a precautionary measure on February 9, 2016, and was released to the general population three days later. [Doc. # 61 at 120, 104-06].

urgent dental visit, and asked for the records of plaintiff's treatment at the SLU Liver Center. Under "Discharge Planning," defendant noted that plaintiff had a court appearance on April 11, 2016, and would return to his previous provider for mental health treatment after discharge. Id. Defendant instructed plaintiff to return for follow up in three months.

On May 5, 2016, plaintiff submitted another Sick Call Form in which he stated that he had been approved for treatment of his hepatitis C and had been told that he needed Harvoni to avoid liver cancer. He also stated that he was very frightened because he had watched his mother die from hepatitis C. [Doc. # 62 at 48-49].

Plaintiff saw defendant again on July 11, 2016. Defendant had not yet reviewed plaintiff's complete medical records from SLU Liver Center[11] and so she ordered lab tests to confirm his diagnosis. Deposition of Mary Vatterott Hastings, M.D., at 133 [Doc. # 68-1]. The tests revealed that plaintiff had what defendant characterized as a "medium" viral load of hepatitis C.[12] Id. at 136. The lab tests also confirmed that plaintiff's virus was appropriate for treatment with Harvoni. Id. at 136-37. In addition, defendant reviewed the results of recent liver function tests, which were normal. Id. at 134, see also id. at 159 (explaining that psychiatrists ordinarily monitor liver function tests in conjunction with certain medications). Defendant obtained yet another authorization for records from the SLU Liver Center. Id. at 65.

Plaintiff and defendant again discussed his desire for treatment with Harvoni on August 3, 2016. Id. at 54-55. Defendant had still not reviewed the records from the SLU Liver Center.

---

[11] The record contains a copy of the SLU Liver Center records faxed to the Justice Center on May 4, 2016. [Doc. # 63 at 64-69]. Defendant initialed the first page on May 19, 2016. [Doc. # 63 at 64]. She testified that she did not know if she saw the other pages at that time. She also testified that the records were not scanned into the computer system when she saw plaintiff in July 2016 and so she would not have remembered reviewing them. Hastings Dep. at 150-51.

[12] At deposition, defendant observed that plaintiff's viral load actually decreased between November 2015 and July 2016. Id. at 157-58.

Hastings Dep. at 150-51; Medical Records [Doc. # 61 at 54] (stating reports from SLU still had not come). Medical records reflect that, on September 8, 2016, plaintiff again told defendant that he had been approved for treatment with Harvoni through the SLU Liver Center. [Doc. # 61 at 41-42]. Defendant called Ms. Campbell, who stated that plaintiff did not qualify for participation in a clinical trial of DAA drugs because he had not had a liver biopsy and was incarcerated. Hastings Dep. at 154; see also Bacon Aff. at ¶ 14 (incarcerated patients are not eligible for clinical trials which require frequent visits to SLU Liver Center for monitoring and bloodwork). According to the medical records, defendant told plaintiff that he did not qualify for the study while incarcerated and should seek treatment when he was released. Plaintiff "understands this." [Doc. # 61 at 41]. Plaintiff complained that his liver hurt and he was anxious. He wanted to restart gabapentin, which he was weaned off when he entered the Justice Center. Defendant noted that gabapentin was not indicated for treatment of his liver complaints and ordered blood work. Plaintiff's physical examination was unremarkable, with the exception of his increased anxiety. Id. at 42. Plaintiff's liver function tests were normal. Id. at 43; Hastings Dep. at 158-59.

Defendant testified that she determined that the appropriate course of action was to monitor plaintiff's clinical condition. Hastings Dep. at 156. As of September 2016, she did not believe it was necessary for plaintiff to start taking Harvoni or other antiviral medications because: (1) his viral load had decreased since November 2015; (2) his liver function tests showed no abnormalities; and (3) he did not complain of nausea, fever, or lack of appetite, and did not have the appearance of jaundice. Id. at 156-58; 168. It was defendant's opinion that plaintiff's condition was stable and even improving, and that it was in his best interest to wait for treatment. Id. at 161-62. She testified that she would have referred plaintiff to a specialist if he

had begun to show signs of deterioration in his health. Id. at 165, 186-87. She acknowledges, however, that she has never referred a Justice Center inmate with HCV to a liver specialist during his or her incarceration. Id. at 173. She does refer patients to liver specialists at SLU or Washington University when they are released from the Justice Center. Id. at 171-72.

Defendant testified that plaintiff's mental health was the primary medical concern during his incarceration. Id. at 166. The medical records show that plaintiff had frequent complaints of anxiety and depression, with occasional complaints of hallucinations and nightmares. Medical Records [Doc. # 61 at 126, 124-25, 121, 120, 118, 117, 115-16, 113, 112, 110-11, 104-05, 99, 97, 87, 85, 63-64, 60-61, 54-55, 50, 39-40, 32, 27-29, 24, 23, 21-22, 18, 16, 10]; [Doc. # 62 at 87, 85, 83, 79, 65, 57, 45, 18, 7]. His care was complicated by multiple adverse reactions to psychotropic medications, necessitating frequent adjustments. Defendant testified that some of his medications were metabolized through the liver, a factor that would be pertinent to treatment with DAAs. Hastings Dep. at 186. In addition, plaintiff was periodically noncompliant with taking his medications. In January 2017, he refused all of his psychotropic medications, because they made him feel sick and because he had paranoid feelings about the corrections officers and the water. [Doc. # 61 at 20, 18; 16]. Defendant testified that she was concerned that he would quit taking DAAs if prescribed. Hastings Dep. at 166.

On February 7, 2017, plaintiff was displaying signs of possible psychosis with rapid decompensation. The evaluating physician determined that plaintiff needed rapid follow up. [Doc. # 61-10]. He was discharged that day.

### D. Plaintiff's Astigmatism and Sleep Apnea

Plaintiff's vision was evaluated by a medical assistant at the Justice Center on July 21, 2016, after he complained about blurry vision. [Doc. # 61 at 58]. His vision was measured as

20/30 combined and 20/40 in each eye separately. On December 5, 2016, plaintiff told defendant that he had acute onset of blurry vision with distance only, possibly in response to medications. <u>Id.</u> at 27-29. He was able to read. His vision measured as 20/25 together, 20/70 on the right, and 20/40 on the left. <u>Id.</u> Defendant planned to follow up with plaintiff in four weeks. When defendant next saw plaintiff on January 31, 2017, he did not complain about his vision. <u>Id.</u> at 13-14. Plaintiff asserts that he was diagnosed with astigmatism after he was discharged from the Justice Center and believes that the condition probably existed for some time before diagnosis. Plaintiff's Answers to Interrogatories at ¶ 3 [Doc. # 59-2]. He has not produced any documentation to substantiate this diagnosis.

Plaintiff admits that he never complained of having sleep apnea or reported symptoms suggestive of sleep apnea while at the Justice Center. He further admits that he has never been diagnosed with sleep apnea. Pl.'s Resp. to Def.'s Stmt. of Uncontroverted Material Facts at ¶¶ 40-41, 44-46 [Doc. # 68].

Additional facts will be included as necessary to address the issues.

**II. Legal Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, a party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Anderson, 477 U.S. at 247. The non-moving party may not rest upon mere allegations or denials in the pleadings. Id. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248. The Court must construe all facts and evidence in the light most favorable to the non-movant, must refrain from making credibility determinations and weighing the evidence, and must draw all legitimate inferences in favor of the non-movant. Id. at 255.

### III. Discussion

Plaintiff claims that defendant was deliberately indifferent to his serious medical needs. "[P]retrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment." A.H. v. St. Louis Cty., Missouri, 891 F.3d 721, 726 (8th Cir. 2018) Id. (citation omitted); see also Ryan v. Armstrong, 850 F.3d 419, 425 (8th Cir. 2017) (standard applied to pretrial detainees "borrow[s] from the Eighth Amendment deliberate-indifference standard applicable to claims of prison inmates"). "Deliberate indifference has both an objective and a subjective component." Corwin v. City of Indep., Mo., 829 F.3d 695, 698 (8th Cir. 2016) (citation omitted). The objective component requires a plaintiff to demonstrate an objectively serious medical need. Id. The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need. Id. That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

### A. Plaintiff's Chronic HCV

Here, there is no dispute that plaintiff's HCV was an objectively serious medical need, and thus the analysis focuses on the subjective component. The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of "more . . . than gross negligence." Saylor v. Nebraska, 812 F.3d 637, 644 (8th Cir.), as amended (Mar. 4, 2016) (citations omitted). Deliberate indifference "requires a mental state 'akin to criminal recklessness.'" Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014) (citation omitted). Demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference. Id. at 1065-66. Plaintiff must demonstrate that defendant's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." Id.

"A plaintiff can show deliberate indifference in the level of care provided in different ways, including showing grossly incompetent or inadequate care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant intentionally delayed or denied access to medical care." Allard v. Baldwin, 779 F.3d 768, 772 (8th Cir. 2015) (citing Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir.1990), and Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002)); see also Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) ("Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment.") (citation omitted). To state a claim based on "inadequate medical treatment . . . [t]he plaintiff 'must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" Id. (quoting Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006)).

Plaintiff argues that defendant's decision to monitor his condition violated the applicable standard of care for treatment of those with HCV, which he claims required defendant to treat him with DAA drugs or refer him to a liver specialist for such treatment. Viewing the evidence in the record and drawing all reasonable inferences in the light most favorable to plaintiff's claims, the Court finds that no reasonable factfinder could conclude that defendant's decision to monitor plaintiff's health was "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." Jackson, 756 F.3d at 1066. First, the undisputed medical evidence shows that plaintiff's disease was "very mild" when he was evaluated at the SLU Liver Center in September 2015, with normal liver function, no increase in fibrosis, and only very mild inflammation. Lab tests in July 2016 showed that plaintiff's viral load had improved since September 2015, and liver function tests in September 2016 were normal. Furthermore, plaintiff's clinical presentation did not show signs that his condition was worsening. Second, Dr. Hasting testified that the average length of incarceration for inmates at the Justice Center was 40 days and she had no guarantee that plaintiff could complete the 12-week course of treatment required for DAA drugs. Defendant's decision to monitor plaintiff's condition rather than administer DAAs is consistent with the IDSA/AASLD Guidelines to counsel jailed patients during the incarceration period, followed by a referral to community healthcare for evaluation and treatment. The Court acknowledges that plaintiff spent slightly more than a year at the Justice Center and that the Guidelines recommend treatment for individuals with jail sentences "sufficiently long" to complete treatment with DAAs. Plaintiff was a pretrial detainee, however, and thus was not serving a fixed sentence of known duration. Defendant was not in a position to know when plaintiff would leave the Justice Center, and she was not required to accept at face value plaintiff's belief that he would remain incarcerated for "awhile."

Plaintiff cites Harrison v. Barkley, 219 F.3d 132, 139 (2d. Cir. 2000), for the proposition that "refus[ing] treatment of a properly diagnosed condition that [is] progressively degenerative, potentially dangerous and painful, and that could be treated easily and without risk . . . is not mere 'medical malpractice.'" In Harrison, the plaintiff "allege[d] that prison officials refused to treat a cavity in one tooth unless he consented to the extraction of another tooth, which was also diseased but which he nevertheless wished to keep." Id. at 134. The "other tooth" in Harrison's case was a "carious non-restorable tooth." Id. The non-restorable tooth was not causing Harrison any pain. Id. The dentist refused to treat the cavity plaintiff wanted fixed claiming that institutional policy required the dentists to treat the more serious condition first. Id. at 136. The prison officials refused to treat Harrison's tooth for "nearly a year," and they would have continued to refuse to treat his tooth indefinitely had they not been required to by a court order to provide treatment. Id. The majority characterized defendants' conduct as: "(1) a flat refusal of medical treatment for a condition that if left untreated is serious and painful; or (2) a conditional refusal of such treatment, subject to Harrison's consent to undergo an unwanted medical procedure that would deprive him of a body part he wished to keep." Id. at 137. The court found that Harrison had stated an Eighth Amendment claim of deliberate indifference.

Here, defendant did not refuse to treat plaintiff's hepatitis C and thus this case is distinguishable from Harrison. She evaluated both plaintiff's physical condition and lab results and determined that his condition was stable. She testified that, if his condition deteriorated, she would have referred him to a liver specialist. In her medical judgment, it was not in plaintiff's best interest to begin a treatment that he might not be able to complete before discharge. This decision is consistent with the IDSA/AASLD Guidelines.

To the extent that plaintiff contends that defendant improperly delayed his treatment with Harvoni or another DAA drug, his claim fails because he has not submitted any medical evidence that he suffered any detrimental effects from the alleged delay. Jackson v. Riebold, 815 F.3d 1114, 1119–20 (8th Cir. 2016) (inmate "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment.") (internal quotation and citation omitted).

Plaintiff argues that a triable dispute of fact arises from what he characterizes as defendant's shifting or contradictory reasons for not treating plaintiff with DAA drugs. See Statement of Additional Facts at ¶ 34 [Doc. # 72]. In the course of her deposition, defendant identified a number of factors that she stated were relevant to her decisions regarding plaintiff's treatment. The testimony, read as a whole, is not contradictory.

Plaintiff argues that he was denied antiviral treatment required by the standard of care for hepatitis C. However, the Eighth Amendment does not mandate that inmates receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997). Plaintiff has failed to establish that defendant's decision to monitor his physical condition rather than start him on DAA drugs amounted to deliberate indifference to his hepatitis. See Roy v. Lawson, 739 F. App'x 266 (5th Cir. 2018) (rejecting inmate's claim that defendants were deliberately indifferent to his hepatitis C "when they failed to refer him for treatment and performed only blood work, labs, and monitoring . . . condition despite the high-risk nature of the disease"); Workman v. Atencio, No. 1:16-CV-00309-BLW, 2018 WL 4496628, at *6 (D. Idaho Sept. 19, 2018) (assuming standard of care for treating hepatitis C requires DAA drugs, plaintiffs did not present sufficient evidence that their particular medical conditions warrant treatment with DAAs

under that standard); Pevia v. Wexford Health Source, Inc., No. CV ELH-16-1950, 2018 WL 999964, at *16 (D. Md. Feb. 20, 2018), aff'd sub nom. Pevia v. Comm'r of Corr., 731 F. Ap'x 243 (4th Cir. 2018) (rejecting plaintiff's argument that, under the Eighth Amendment, "as soon as Harvoni became available he was entitled to receive it"); Phelps v. Wexford Health Sources, Inc., No. CV ELH-16-2675, 2017 WL 528424, at *9 (D. Md. Feb. 8, 2017) (medical defendants entitled to summary judgment on inmate's claim that he was improperly denied Harvoni where he was regularly monitored for his HCV and his test results continue to show an absence of viral load).

### B. Plaintiff's Astigmatism and Sleep Apnea

Defendant argues, and plaintiff does not dispute, that there is no medical evidence in the record that plaintiff suffered from astigmatism or sleep apnea during his incarceration. Thus, plaintiff has failed to establish that these complaints constitute a serious medical condition.

\* \* \*

The Court finds that defendant is entitled to summary judgment on the undisputed material facts on plaintiff's claims. The Court thanks appointed counsel for their invaluable assistance in this important case. Pursuant to E.D. L.R. 12.03, counsel may request compensation of services and reimbursement of out-of-pocket expenses. A request form may be found on the Court's website, at https://www.moed.uscourts.gov/appointed-counsel-fees-and-expenses.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. # 57] is **granted**.

**IT IS FURTHER ORDERED** that plaintiff's motion to strike [Doc. # 69] is **denied as moot**.

A judgment in accordance with this Memorandum and Order will be entered.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of December, 2018.